# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Safety Training Systems, Inc. ) ASBCA Nos. 57095, 57166
)
Under Contract No. W912ER-06-C-0018 )

APPEARANCES FOR THE APPELLANT: James F. Nagle, Esq.
Anne Marie Tavella, Esq.
  Oles Morrison Rinker & Baker, LLP
  Seattle, WA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
James D. Stephens, Esq.
Jeremy Becker-Welts, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD

ASBCA No. 57095 is an appeal from the deemed denial of a claim seeking an equitable adjustment of $1,550,603.87 for increased costs under a contract to supply an aircraft trainer to the King Abdullah II Special Operations Training Center (KASOTC) in Yajooz, Jordan. ASBCA No. 57166 is an appeal from the final decision on the same claim and they are consolidated.

A hearing was held in Tulsa, Oklahoma, and the record consists of the hearing transcript (tr.), the government's Rule 4 file (R4, tabs 1-42), a government supplement (Supp. R4, tabs S1-S33), appellant's Rule 4 submission (App. supp. R4, tabs S100-S285) as well as initial and reply briefs from both parties. While only entitlement is before us, with damages reserved, the parties were cautioned that if there is a claim for delay, the extent of delay is part of the entitlement case (tr. 1/7-8, 10; Bd. Order dated 28 April 2010).

## FINDINGS OF FACT

1. In early 2006, the U.S. Army Corps of Engineers, Transatlantic Programs Center, (Corps or government) contacted Safety Training Systems, Inc., of Tulsa, Oklahoma (STS) about the possibility of supplying the Kingdom of Jordan with an

aircraft training simulator. The plan called for STS to acquire a used airframe to modify for anti-terrorist training. (Tr. 2/35-36)

2. STS met with the Corps, the Jordanian customer, and Stanley Consultants (Stanley) in Muscatine, Iowa, on 9 March 2006. The meeting was in Stanley's offices and STS later realized that this meeting was a 50% design review for Stanley, which was performing the design for the whole site where the simulator would be installed (tr. 2/38-40; app. supp. R4, tab S101). In that meeting the participants discussed several types of airframes but settled on the Airbus A-300 (A300) (tr. 2/50).

3. Thereafter, on 14 May 2006 the Jordanian customer, KASOTC, informed the Corps of Engineers that it requested STS to be the supplier of the A300 aircraft training platform (app. supp. R4, tab S102). The Director of Procurement for the Jordan Armed Forces reiterated that request on 16 May 2006 (app. supp. R4, tab S103).

4. Consequently, the contracting officer (CO) made a Determination and Findings that it was appropriate to execute the procurement using other than full and open competition since the customer in this Foreign Military Sales transaction had provided a written directive to limit the procurement to STS (app. supp. R4, tab S103).

5. The Request for Proposals (RFP), issued on 2 August 2006, called for STS to modify an A300 airframe to serve as a simulator for anti-terrorist training (R4, tab 3 at 4). The offer was due on 16 August 2006 (R4, tab 3 at 1, 4, 20 of 22; app. supp. R4, tab S105; tr. 2/59). STS returned its offer on 3 August 2006 (R4, tab 10; tr. 2/60). In compiling its bid for the project, STS located an A300 airframe in Arizona (tr. 2/51).

6. On 15 August 2006, the Corps awarded Contract No. W912ER-06-C-0018 to STS. The award was in the firm fixed-price amount of $2,150,286 and called for the delivery and installation of the A300 Airbus training platform in accordance with the Scope of Work and to be complete at Yajooz, Jordan, by 1 September 2008. (R4, tab 3 at 1, 4-5) The amount of the award was the same amount as included in STS's proposal (R4, tab 12). The contract was awarded as a commercial item based on the CO's justification that "STS ha[d] provided substantially similar items to private industry and other government agencies" (R4, tab 12). However, because STS had previously converted many different platforms (i.e., various airplanes and boats) there was no price list and the government prepared an independent government estimate prior to awarding the contract. In preparing the estimate, the government used the solicitation and information found on STS's own website. The government's estimate came to $2,257,498. Of that amount, $329,462 ($296,813 + $32,649 for profit) was allocated for shipping. (R4, tabs 11, 12) The contract was modified twice for reasons unrelated to the claim and those modifications increased the total contract price to $2,274,889.57 (R4, tabs 4, 5).

2

7. The contract included FAR 52.212-4, CONTRACT TERMS AND CONDITIONS –COMMERCIAL ITEMS (SEP 2005) which contained a Changes Clause (paragraph c) providing simply that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties" and a provision for excusable delays (paragraph f) which states in part:

> The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.

(R4, tab 3 at 6-7)

8. In addition the contract included FAR 52.247-34, F.O.B. DESTINATION (NOV 1991), which provided in part that the contractor would "[d]eliver the shipment in good order and condition to the point of delivery specified in the contract" and "[p]ay and bear all charges to the specified point of delivery." (R4, tab 3 at 15) The contract incorporated by reference the clause prescribed at DFARS 252.247-7023, TRANSPORTATION OF SUPPLIES BY SEA (MAY 2002), which required the contractor to "use U.S.-flag vessels when transporting any supplies by sea under [the] contract." Further the clause set forth a procedure to follow when the contractor wanted authorization to ship in a foreign flag vessel instead of a U.S.-flag vessel, which included submitting certain information to the CO.

9. STS's itemized list of costs used in preparing its bid shows that STS included $313,774 for shipping the trainer (supp. R4, tab S12 at 2; tr. 2/159). The shipping cost included in the itemization did not differentiate the costs of the various phases of shipping the A300 from Arizona to the company's plant in Tulsa, Oklahoma, or from Tulsa to the port of embarkation or from the port of embarkation to the port in Aqaba, Jordan, or from there to the trainer's final delivery point at the KASOTC in Yajooz, Jordan (supp. R4, tab S12 at 2; tr. 2/144-45). Michael Wilson, vice president and general manager of STS, testified that of the $313,774 in shipping costs included in STS's bid, about $104,000 was for the cost of shipping from Arizona to Tulsa and about $230,000 was allocated to the leg from Tulsa to Yajooz (tr. 2/144), for a total of about $334,000. Wilson explained the discrepancy between what was included in the estimate ($313,774) and the planned allocations total ($334,000) as follows:

3

Now, the reason that may not match this was because this was our original breakdown of the bid, which has a variance in there that we'll trade labor dollars, other things – we'll trade what we might call, you know, part of our padding the bid to turn it into other types of dollars: material dollars, subcontractor dollars, or whatever.

So this was our preliminary numbers that went in, but it may not have been how we actually ran the job.

(Tr. 2/145)

10. Following award, STS found that the cost of transporting the plane from Arizona to Tulsa and from Tulsa to Jordan was significantly more than originally budgeted (app. supp. R4, tab S275; tr. 2/63-64, 3/7, 3/27-28). Despite the increased cost of shipping from Arizona to Tulsa, STS was still under budget prior to signing an agreement for shipping to Jordan because it was able to acquire the plane for a favorable price (tr. 2/168, 3/14-17). On 19 September 2006, STS sought assistance from the government which they said could be in the form of additional funds, making the shipping FOB at STS's dock, or arranging for the trainer to ship with other government shipments going to the same area of the Middle East (app. supp. R4, tab S275; tr. 3/7).

11. Once the airframe was acquired, STS's plan for supplying the trainer to KASOTC was to disassemble it at the point of acquisition, move the parts to Tulsa, perform modifications and ship the trainer to Jordan in pieces small enough to fit in standard shipping containers (tr. 2/36, 3/28). After the parts reached Jordan, the trainer would be reassembled at KASOTC (tr. 2/36). However, STS discovered after award that cutting the trainer into pieces small enough to place in shipping containers would compromise the structural integrity of the plane. Therefore, STS revised its shipping plan to place the pieces in custom built crates. (Tr. 3/28, 33-35)

12. In an attempt to reduce the cost of shipping by use of a non-U.S. flagged vessel, by email dated 7 March 2008, STS forwarded copies of the shipping quotes it had received from both U.S. and foreign-flag vessels. The CO informed STS that it had not provided all the information necessary. Nevertheless, she forwarded the quotes to the Department of Transportation (DOT) for its opinion whether a foreign-flag vessel waiver was appropriate, stating that the DOT was the expert. By email of 12 March 2008, the DOT informed STS that it had not received a copy of the quotes. The DOT's email also informed STS of the additional information that was necessary to process their request. (App. supp. R4, tab S124)

4

13. By email dated 25 March 2008, STS sought guidance from the government regarding a perceived dilemma they faced with respect to the rising cost of shipping. They had not entered into a firm commitment for shipping to Jordan and were hesitant to begin the breakdown and crating process before doing so in the event the eventual shipper had a different requirement for crating. By email of the same date, the CO informed STS: "Your contract requires shipment with a US flag carrier as you know." She also opined: "I would venture to say that if you delay the shipment, the prices will only increase and then this could also affect your required delivery schedule." (App. supp. R4, tab S125) The next day, by email of 26 March 2008, STS "formally request[ed] a waiver from having to use a U.S. Flag carrier...based on the excessive cost differences between the U.S. and Non-U.S. flag commercial vessel pricing." This email attached a summary of the shipping quotes received by STS to date and other information, but not necessarily all required information, relevant to a request for waiver of the U.S.-flag shipping requirement. The lowest priced quote included on the list was from Clark Manco International, Inc., at $803,346. Clark was a U.S.-flag carrier. The quote consisted of $344,946 for Tulsa to Port Arthur, Texas, and $458,400 for Port Arthur to Jordan. (App. supp. R4, tab S127)

14. The CO replied by email of 27 March 2008 stating that:

> I have reviewed all documentation provided. This is not a case for a US Flag waiver because a US Shipper has the lowest shipping proposal who is Clark Manco Int at $458,4[00].00.
>
> I would recommend the following to you. Lock this shipment in with them as soon as possible because I do not see the rates going down. You can truck to the port on any carrier you wish, this in no way ties into the US Flag requirement so I would quote it as STS in lieu of thru the shippers.
>
> Tom and I have contacted some people in Jordan on trucking rates from the port to the sight [sic] and will follow up with you when the information is received.

(App. supp. R4, tab S128)

15. The CO's 16 April 2008 email reiterated: "This situation is not a case for waiver of US Flag. I again recommend you proceed at once to get the shipment booked as required by your contract." However, to assist STS, the government did agree to proceed "with arranging the shipment from the port in Jordan to the job site." The CO

5

reminded STS that its failure to proceed with shipment could place them in default, a circumstance the CO did not think either party wanted. (App. supp. R4, tab S145)

16. The cost of oil climbed from $70 a barrel at the time of contract award in 2006 to $125 a barrel in June of 2008 and during that same period of time, shipping costs for dry goods more than doubled (app. supp. R4, tabs S282, S283; tr. 2/70-76).

17. As stated above, STS could not ship the trainer in standard shipping containers but found it was necessary to custom crate the disassembled trainer (finding 11). With the trainer crated for shipping, as of 21 April 2008, STS had narrowed its shipping options down to one U.S.-flag ocean carrier, the marine vessel El Faro. According to the Liner Booking Note, the trainer was to be loaded onto the vessel at the Port of Beaumont, Texas, to be shipped sometime between the 20th and 30th of May 2008. The port for discharge was Aqaba, Jordan, and the cost of the freight was a lump sum of $834,807.00. (App. supp. R4, tab S155 at 20) This amount increased to $943,364.50 due to an overage of the freight (app. supp. R4, tabs S171, S172). Sometime between 21 April 2008 and 5 May 2008, STS finalized the contract to ship the trainer on the El Faro (app. supp. R4, tabs S155, S156).

18. After STS had executed its contract for shipping the trainer, it received notice that the El Faro was delayed and would not arrive at the Port of Beaumont for loading until 17-20 June 2008 with arrival in Aqaba, Jordan, estimated for 10 July 2008 (app. supp. R4, tab S156). The date for the El Faro's arrival in Beaumont, Texas, continued to slip to 26-29 June 2008 (app. supp. R4, tab S159), then to 30 June (app. supp. R4, tab S161) and then to 1 July 2008 (app. supp. R4, tab S165). Eventually, by 9 July 2008 the El Faro had arrived at the Port of Beaumont and was being loaded (app. supp. R4, tabs S166, S167). Based on the most conservative original loading date of 30 May 2008 to 9 July 2008, when the El Faro was finally in port for loading, STS experienced about a 40-day delay from what was originally anticipated.

19. On 14 July 2008, the El Faro sailed from the Port of Beaumont with an estimated arrival at the Port of Aqaba of 7 August 2008 (app. supp. R4, tab S169). Due to multiple delays, the shipment arrived in the Port of Aqaba on 8 September 2008 (app. supp. R4, tabs S170, S175, S176, S177, S183 at 2, tabs S185, S190). From Aqaba, the trainer crates were transported and arrived at KASOTC on 11 September 2008 (app. supp. R4, tab S190).[1] From the original estimated arrival date of 7 August 2008 to the

---

[1] The email at app. supp. R4, tab S190, erroneously says the arrival at Aqaba was 8 August 2008 when it was actually 8 September and that arrival of the aircraft at the project site was 11 August 2008 when it was actually 11 September. We know it was erroneous in the context of other statements in that exhibit and other

6

actual arrival date of 8 September 2008 in the Port of Aqaba, there was a 32-day delay in transportation. This 32-day delay together with the earlier 40-day delay resulted in an excusable performance delay of 72 days under the terms of the contract which includes FAR 52.212-4(f) covering excusable delays due to common carriers (R4, tab 3 at 6). There is no evidence that either the 40-day or the 32-day shipping delays were caused by or were within the control of either STS or the government. While 52.212-4(f) excuses default, the government has no liability under the clause for contractor expenses due to such delay.

20. During the initial, pre-contract meeting with the government in Kansas, the parties discussed the need for equipment and labor on site at KASOTC; however, the discussion was general in nature and lacked specifics (tr. 2/42-44). STS's need for equipment and labor was addressed in the contract as follows:

> 4. MOCKUP INSTALLATION: The Government shall provide heavy lifting equipment and a minimum of 6 laborers during the assembly of the fuselage structure on site.

(R4, tab 3 at 21)

21. By email dated 5 March 2007, STS wrote the government requesting information regarding the lifting equipment. The email reads as follows:

> Just thought that we should ask about the lifting equipment that will be available in Jordan. Crane size/capacity, spreader bar, lifting cables, etc. and the size and number of forklifts, scissor lift. What about aircraft maint jacks and entry ramps/stairs up to the entry doors. When you have an idea what will be available could you forward that information on to us?
>
> We are looking for a 50 ton crane, two 15,000 forklifts, four large capacity aircraft jacks, 15 foot long spreader bar with a 20-25 thousand lb capacity. (Assorted lifting cables and straps for the spreader bar.) To install the tail section we would like to have a cherry picker along with the crane.

(Supp. R4, tab S5)

---

contemporaneous documents in the record indicating the expected arrival at Aqaba was 8 or 9 September 2008. (*See* app. supp. R4, tabs S181, S187, S188)

22. By email dated 12 March 2007, the government's project manager, Thomas A. Jackson, redirected the inquiry to Salem A. Fares, the resident engineer in Jordan, writing:

> We will need to speak with Colonel Maher on this subject. When we had the design review in Muscatine, Colonel Maher committed to provide labor and lifting equipment to assist in assembly of aircraft training platform. I don't know if he will remember or not. Based on the commitment of Colonel Maher we added the following language to the contract, "MOCKUP INSTALLATION: The Government shall provide heavy lifting equipment and a minimum of 6 laborers during the assembly of the fuselage structure on site." If the Colonel does not remember the discussion we can use project funds to support the STS effort[.] Please let me know how you want to handle the matter. We could even ask STS to cover this and give them a mod to reimburse them.

(Supp. R4, tab S5)

23. In the minutes of a 7 June 2007 meeting between STS and Mr. Jackson, it was recorded that "Tom Jackson requested a list of equipment needs for aircraft reassembly and installation in Jordan. Mr. Jackson informed STS that all necessary equipment will be provided by the contractor on site in Jordan, American International Contractors, Inc. (AICI). A list was provided to Mr. Jackson by Mr. Russell Latham." Mr. Jackson was requested to "[p]lease review the attached minutes and let me know if there is any additional information you would like me to capture." The minutes of the meeting were forwarded to the CO. (App. supp. R4, tab S112) The first itemized list compiled by STS reads as follows:

| | |
|---|---|
| 1ea | 50-70 ton crane, (readily available or full time) |
| 1ea | 50-70 ton crane (for two days TBD) |
| 2ea | 10-20 ton fork lifts (full time) |
| 1ea | Man lift, 20' height (full time) |
| 1ea | 3 ton fork lift (full time) |
| 1ea | AC & DC portable power unit (gas or diesel) (full time) |
| 1ea | Portable MIG Welder with CO2 gas shielding and equipment (full time) |
| 1ea | Oxygen/Acetylene Rig (cutting torch) (full time) |
| 3ea | Large aircraft jacks |

Handwritten at the end of the list was "stair up to aircraft." (Supp. R4, tab S31; tr. 2/205)

24. By email dated 23 January 2008, STS reiterated its first itemized list and added the following:

1 ea    Cherry Picker (bucket lift) (full time)

1 ea    Air compressor (50/75 CFM@100 PSI) to be powered from generator if facility power is not available or it could have it's [sic] own gas or diesel motor.

(Supp. R4, tab S11; tr. 2/205)

25. While STS's 5 March 2007 email discusses the need for a spreader bar, neither STS's first itemized list nor its 23 January 2008 list included a spreader bar (supp. R4, tabs S5, S11; tr. 2/238).

26. As to the qualifications of the laborers to be provided in Jordan, STS wrote the government by email of 11 September 2007, stating: "Can you give me any ideas of the labor types we can expect on site in Jordan? We are trying to define which items could be best completed on site with local labor, i.e. painting, installation of aircraft hardware, lifting, etc. What can we expect?" By email of the same day, the government responded: "We will have labor to assist the assembly. I was of the understanding that we would support you with labor and you will be furnishing the skilled personnel." (Supp. R4, tab S9) Russell Latham, STS's program manager, agreed at hearing that it was anticipated that one of the contractor's four employees would spend most of his time supervising the laborers (tr. 3/40-42).

27. The government contracted with a third-party, AICI, to provide STS with mockup installation support. The contract between the government and AICI called for AICI to: "[p]rovide all equipment, support and materials to facilitate the transportation and shipment for the A300 Mockup Aircraft from Aqaba to KASOTC including support of installation and erection by STS." (App. supp. R4, tabs S180, S182) STS's original estimate of the time needed for labor and equipment support was six to eight weeks (supp. R4, tab S20; tr. 2/108).

28. Three days after the crates arrived at the trainer project site at KASOTC, there was a serious accident that temporarily halted contract performance. On 14 September 2008, one of the AICI laborers drove a forklift into one of the crates as a means to open the crate, while a second laborer pulled on the wooden crate. At that moment, a wooden two by four plank separated from the crate and hit the second laborer in the head. As a

9

result of the accident, the laborer was critically injured. (App. supp. R4, tabs S191, S194)[2]

29. Following the accident, by letter dated 21 September 2008, the CO asked that STS provide its Safety Plan and Activity Hazard Analysis for the work activity incident to the assembly of the A300 aircraft at KASOTC within one calendar day, 22 September 2008 (R4, tab 27).

30. STS's 22 September 2008 email response stated that the company was committed to safety and had published safety procedures, but because the contract was a commercial items contract, no safety plan or activity hazard analysis specific to the A300 KASOTC program was required. By letter dated 28 September 2008, the CO stated that STS should submit critical safety documents no later than close of business the next day or "[f]ailure to do so could result in a shutdown of your performance on the site until provided." At a minimum STS was to provide "STS's safety plan, crane critical lift plan, hot work-welding procedures, high work and fall protection plan." (R4, tab 29)

31. STS's 29 September 2008 response reiterated the company's commitment to safety, while pointing out that the laborers and equipment supplied on site were under the supervision of the government and its subcontractor. Thus the onus for safety referenced in the CO's letter was not the responsibility of STS. STS also stated that its company safety policy and procedures were being supplied to the CO by separate mail. (R4, tab 30)

32. By letter dated 30 September 2008, the CO enumerated three areas where STS's safety policy and procedures were inadequate. Further, the CO stated that STS's employees continued to commit safety violations as they were proceeding ahead with work for which no safety procedures had been identified or approved. STS was told that in its schedule of operations it should identify the different phases of work such that no work could start prior to approval of the proper procedures and further was admonished that any delays in assembly due to STS's failure in completing those requirements would be the responsibility of STS. (R4, tab 31)

33. By unilateral modification issued on 3 October 2008, the CO changed the contract to add a safety requirement. The modification did not compensate STS for the change nor does the claim include costs associated with that change. (R4, tab 6)

34. With regard to safety, the contract provides that the contractor will comply with "40 U.S.C. 3701, et seq., Contract Work Hours and Safety Standards Act"

---

[2] While both parties propose findings that the laborer died as a result of this accident (gov't br., finding 26; app. br., finding 37), the evidence cited by the parties does not support that conclusion.

(R4, tab 3 at 9). Chapter 37 of 40 U.S.C. generally provides that contracts entered into by the Federal Government are subject to certain health and safety standards and other prohibitions and requirements.

35. However, 40 U.S.C. § 3701(b)(3)(A)(i)(III) contains an exception for open market items. Further, 40 U.S.C. § 3707 (Contractor certification or contract clause in acquisition of commercial items not required), specifically states that 40 U.S.C. § 3701 *et seq.*, does not apply to commercial contracts.

36. The safety clause unilaterally added by the CO was not a required clause. The jobsite was closed for a total of six days as a result of safety issues (R4, tab 9 at diary log) that were not caused by STS but by another government contractor.

37. AICI frequently supplied equipment that was either unsafe or did not properly function. Because of this faulty equipment, STS experienced delays in reassembling the trainer at KASOTC. (Supp. R4, tab S24; app. supp. R4, tabs S214, S220, S226, S227, S228, S231; tr. 2/207-13)

38. Because the trainer arrived at the KASOTC jobsite 72 days later than planned (finding 19), its arrival coincided with the Muslim religious holy period of Ramadan. This meant that during this period, the laborers and heavy equipment operators supplied by the government would not work six, eight-hour days per week as contemplated, but only 6 six-hour days. Some weeks during Ramadan the laborers worked less than 6 days. (R4, tab 17; supp. R4, tab S21 at 2; app. supp. R4, tabs S178, S180; tr. 2/223) The period during which STS was supplied local labor also coincided with the Eid al-Fitr holidays during which all laborers and equipment operators were off work and the KASOTC jobsite was closed (app. supp. R4, tab S180; tr. 2/224).

39. STS was under the impression that the government, through AICI, was responsible for providing a spreader bar and lifting straps needed to lift the plane into position (tr. 2/213-14). When asked about who had the responsibility for supplying the spreader bar and lifting straps, the CO stated it was STS's responsibility. At the time when STS requested the spreader bar and straps in October of 2008, government representatives pointed out that the bar and straps were not on the list of items requested by STS and the government had no way of knowing this would be required. (R4, tab 32; app. supp. R4, tabs S222, S223, S228) STS made the spreader bar locally at additional cost to STS (R4, tab 8 at 21; tr. 2/214, 221-22). STS obtained the straps locally in Jordan at its own cost (app. supp. R4, tab S229; tr. 2/214). The lifting of the trainer into its permanent position took place on 25 November 2008 (app. supp. R4, tabs S243, S247).

40. While the contract stated that the government would provide a minimum of 6 laborers, laborer was not defined and the skill level of the laborers was not specified

11

(R4, tab 3 at 21) although when asked in September 2007, Mr. Jackson, the government's project manager, said the labor would be able to assist in the assembly (finding 26). STS had previously supplied aircraft trainers to commercial airlines, and in assembling and delivering these trainers to those customers, the airlines assisted by supplying trained personnel skilled in using basic hand tools including wrenches, crowbars, pliers and socket sets (tr. 2/45-49). The laborers supplied by the government through AICI were young, unskilled laborers with no apparent experience working with aircraft; nor were they experienced with the tools necessary for assembling the trainer, and with the exception of two laborers, they did not speak English.

41. Michael W. Wilson, an employee of STS, testified that during performance on site he prepared a document, transmitted on 29 October 2008 to Graham Smith of STS, which detailed the number of STS and labor man-hours lost to specific delays from 14 September to 13 October 2008 (app. supp. R4, tab S231; tr. 2/219-22).

42. Due to delays caused by faulty equipment, the religious and local holidays, and the lack of skilled laborers, STS alleges it incurred additional expenses in employee labor costs and extended per diem (R4, tab 9 at 21). Also because of these delays, as well as the 72-day delay in shipping, STS alleges its employees were called upon to work during the colder months of fall and winter, leading to inefficiencies in performance as they did not have proper cold weather gear (R4, tab 9).

43. STS prepared a spreadsheet (5 pages) of hours lost for various reasons between 11 September and 31 December 2008 and included it in the REA. The spreadsheet is uncontroverted.[3] (R4, tab 9) We find that the information contained in the REA timeline and the information contained in the 29 October 2008 document is generally consistent with the information in the REA spreadsheet. The spreadsheet shows that appellant lost 1139 man-hours to various causes through 31 December 2008 and at 10 hours per man per day, that number converts to 113.9 man days and since about 4 employees were generally on the job, it further amounts to 28.5 calendar days.

44. While the spreadsheet is uncontroverted and essentially unexplained in the record, we analyzed the spreadsheet to determine the causes cited for lost hours so as to determine whether such causes are due to the government. On the left side there is a

---

[3] There is an obvious error on the entry for 20 September 2008 which shows that STS had four employees who planned to work 10 hours each for a total of 40 hours. However as a result of safety issues they lost 40 hours and inexplicably also lost 6 hours supervising laborers. If STS planned to work 40 man-hours that day, it could not have lost 46 man-hours during the same period. We recognize the discrepancy but because of the de minimus impact we do not correct the sums of the columns in the spreadsheet when discussing them in this opinion.

column entitled "STS – Lost hours/reason." The sum of the hours lost in that column is 60 and appellant alleges the 60 hours were lost due to the Corps. No reason is included in the column and we have not been directed to anywhere in the record outside the spreadsheet where we might find the reason. But, if we look to the far right column, the last one on each sheet entitled "Events" we find reasons across from each date. Following is a summary of the information with respect to the 60 man-hours – the date, the number of hours lost and the event:

| 14 September 2008 | 16 | Accident |
| 22 September 2008 | 10 | Site Laborers had to obtain site passes which took time. Ramadan was also in effect |
| 23 September 2008 | 10 | Ramadan – only six hours per person worked today |
| 02 October 2008 | 12 | EID – Local holiday, none of the site laborers came to work today. |
| 29 October 2008 | <u>12</u> | Bad weather – Thunder and Lightning |
| Total Hours | 60 | |

(R4, tab 9, attached spreadsheet)

45. The next column is entitled "STS – Lost Hours Due to BFE Equipment," which we assume summarizes the hours lost due to malfunctioning and improper government-furnished equipment. The total claimed is 336 man-hours and we find STS has demonstrated 336 hours were lost due to equipment problems including the accident in early September 2008.

46. The next column is entitled "STS – Supervision Hrs." and it totals 743 hours. Appellant alleges these hours were lost supervising the laborers. However, STS expected to use one of its four employees as a supervisor of the laborers most of the time (tr. 3/41-42) and thus we find no credible proof that this supervision exceeded that which was planned and was presumably included in its offer.

47. On the right half of the spreadsheets are two columns recording time lost by laborers and equipment operators provided by the Corps through another contractor (AICI). The first is entitled "ACOE – Lost Hours / 'event'" and the second is entitled "ACOE – Lost Hours / Ramadan & Eid." The lost hours event column totals 408 man-hours and the lost hours Ramadan column totals 846 hours. STS did not pay these

13

workers so we presume the lost hours here are used to show an effect on STS employees, which was not proved and/or as a number that figured into the loss of efficiency claim, but that is also unexplained.

48. The contract was completed and the Jordanian customer took delivery on 10 February 2009 (supp. R4, tab S29).

49. By letter dated 6 July 2009, STS submitted a request for equitable adjustment (REA) in the amount of $1,550,603.87 of which $1,000,619.16 was for unforeseeable shipping costs, $389,970.35 for the alleged failure of government equipment and labor, and the remaining $160,014.38 was for alleged government-caused delays (R4, tab 8 at 1, 24). The CO denied the request on 23 October 2009 (R4, tab 7).

50. The contractor then converted its REA into a certified claim dated 10 November 2009 (R4, tab 9). By letter dated 27 January 2010, STS appealed the deemed denial of its claim (R4, tab 1). The appeal was docketed as ASBCA No. 57095. The CO subsequently issued a final decision denying the claim on 1 March 2010 (R4, tab 2). Appellant timely appealed the final decision which was docketed on 29 March 2010 as ASBCA No. 57166. Without objection the Board consolidated the two appeals.

## DECISION

Appellant's REA consists of three areas for which damages are sought: Unforeseeable Shipping Costs—$1,000,619.16, Failure of Government Equipment and Labor—$389,970.35, and Government-Caused Delays—$160,014.38, for a total of $1,550,603.87. Each is discussed and decided below.

## I. Unforeseeable Shipping Costs

While the contract was awarded on a sole source basis pursuant to an RFP, it was a fixed-price contract with no escalation provisions, which called for STS to deliver the trainer FOB destination. Thus the risk of rising costs was on the appellant. It is undisputed that STS incurred more shipping costs than it included in its offer and the resulting contract. Appellant's bid included $313,774 for shipping and, insofar as we can determine, it consisted of the cost of shipping the frame from Arizona to Tulsa, from Tulsa to the port of embarkation, from there to the port at Aqaba, Jordan, and on to the installation site at Yajooz.

Soon after acquiring the airframe, STS knew its costs would exceed what was included in its bid, so it sought a waiver of the requirement of a U.S.-flag carrier and in the context of seeking that approval it was found that the lowest quote was in fact a U.S.-flag carrier, essentially mooting the point.

14

Appellant advances several theories for escaping its responsibility for the increased costs and the government opposes all those theories on the basis that appellant has failed to prove the necessary elements of each.

Commercial Impracticability

Generally, "commercial impracticability is a subset of the doctrine of legal impossibility that excuses performance when costs become excessive and unreasonable due to an unforeseen supervening event not contemplated by the contracting parties." *Spindler Construction Corp.*, ASBCA No. 55007, 06-2 BCA ¶ 33,376 at 165,462. The law excuses performance, or where government contracts are involved, grants relief through a change order, where the costs of performance amount to commercial senselessness. It does not grant relief just because performance cannot be achieved most economically. *Natus Corp. v. United States*, 371 F.2d 450, 457 (Ct. Cl. 1967).

We stated in *Shubhada Industries, Inc.*, ASBCA No. 54016, 08-1 BCA ¶ 33,733 at 167,019, as follows:

> The doctrine of impossibility does not require a showing of literal impossibility, but only of commercial impracticability, but appellant must show that a supervening event, after it entered into the contract, made performance impracticable; the event's non-occurrence was a basic assumption upon which the contract was based; the occurrence of the event was not its fault; and appellant did not assume the risk of occurrence.

Appellant's theory of commercial impracticability fails on three of the four points. As to the first element, the instability in the cost of shipping the trainer to Jordan did not make contract performance impracticable. As discussed in *Raytheon Co. v. White*, 305 F.3d 1354 (Fed. Cir. 2002), "[w]hether performance of a particular contract would be commercially senseless is a question of fact." *Id.* at 1367 (citing *Maxwell Dynamometer Co. v. United States*, 386 F.2d 855, 870 (Ct. Cl. 1967)). "A contractor is not entitled to relief 'merely because he cannot obtain a productive level sufficient to sustain his anticipated profit margin.'" *Id.* (citing *Natus Corp.*, 371 F.2d at 457). Appellant's assertion in its brief that the contract was impracticable because shipping costs increased 544% is flawed because it compares only its original transportation estimate to the amount it eventually spent on transportation. Commercial impracticability is more appropriately determined by comparing the total contract price to the cost of performance. *See, e.g., Soletanche Rodio Nicholson (JV)*, ENG BCA Nos. 5796, 5891, 94-1 BCA ¶ 26,472 at 131,779 (extreme difference in total cost and time of performance

15

justified finding of commercial senselessness); *Federal Electric Corp.*, ASBCA No. 12449, 69-2 BCA ¶ 7796 at 36,195 (law excuses performance if the "costs of performance" amounts to commercial senselessness); *accord Ace Services, Inc.*, GSBCA Nos. 11771, 11830, 93-2 BCA ¶ 25,848 at 128,619 ("[t]ribunals look to the increased cost of performance of a contract, taken as a whole, as a guide in determining whether the rise is excessive and unreasonable.").

Here, the contract price including change orders was $2,274,889.57. We do not know exactly what the total cost of performance was, but taking appellant's word that it lost $2 million on the contract (app. br. at 33), yields an estimated cost of performance of $4,274,889 or about a 47% increase in costs and this figure includes increases from all causes, shipping from Arizona to Tulsa and Tulsa to Texas and any losses it incurred on the ground in Jordan set forth elsewhere in the claim. This increase is far short of 544% alleged by appellant and under the current case law, this 47% cost overrun does not establish commercial impracticability caused by the alleged supervening event—the increase in overseas shipping costs. *See Raytheon Company*, 305 F.3d at 1368 (finding a contract with a 24%, or even a 57% overrun does not by itself establish commercial impracticability).

Secondly, there is no evidence that the parties' agreement included a basic assumption that transportation costs would not change; on the contrary, it would be wholly unreasonable of any contractor to assume that the price of oil and associated transportation costs would remain constant. Likewise, as to the fourth element, a fixed-price contract assigns any increase in costs to the contractor, thereby insulating the government from price fluctuations, just as it did here. *Spindler Constr.*, 06-2 BCA ¶ 33,376 at 165,462-43, *see also Demusz Mfg. Co.*, ASBCA No. 55310, 07-1 BCA ¶ 33,510 at 166,054.

CO's Abuse of Discretion

Appellant's main support for arguing the CO abused her discretion was her inclusion of FAR 52.247-34, F.O.B. DESTINATION in the contract. Appellant cites to FAR 47.304-3, SHIPMENTS FROM CONUS FOR OVERSEAS DELIVERY, which states that unless there are valid reasons to the contrary, acquisition of supplies originating within CONUS for delivery outside CONUS shall be made f.o.b. origin and that justification for offers other than f.o.b. origin shall be recorded and documented in the contract file. Appellant maintains that the lack of evidence indicating the CO followed this section of the FAR was an abuse of discretion.

In addressing appellant's argument, we look to FAR 47.301-1, GENERAL, at paragraph (a), which states that "[t]ransportation and traffic management factors are important in awarding and administering contracts to ensure that (1) acquisitions are

16

made on the basis most advantageous to the Government." We are also mindful that FAR 47.304-1 at paragraph (f) adds: "[w]hen acceptance must be at destination, solicitation shall be on an f.o.b. destination only basis." Therefore, the CO's primary duty in determining whether the contract was to be awarded f.o.b. origin or f.o.b. destination was to ensure that the decision was the most advantageous to the government. While there is no evidence that the CO recorded and documented the steps taken to ensure that the government's position was the most advantageous, it is clear that the CO achieved the primary goal of FAR Subpart 47.3—TRANSPORTATION IN SUPPLY CONTRACTS, which is to obtain a result most advantageous to the government. We also note that by the very nature of the acquisition, the delivery and installation of a working trainer at Yajooz, Jordan, the trainer could not have been accepted at origin as STS's duties did not end at its Tulsa plant. In accordance with the contract, it was also STS's duty to deliver and install the trainer in Yajooz, Jordan (finding 6). Therefore, pursuant to FAR 47.304-1(f), which provides that when acceptance must be at the destination, the solicitation should be on an f.o.b. destination basis, we find that the CO properly complied with the terms of the FAR with the inclusion of the f.o.b. destination clause. Further, even if the CO failed to fully consider FAR Subpart 47.3 prior to issuing the solicitation, it is immaterial. FAR Subpart 47.3 exists primarily as a benefit to the government, not STS; therefore, it creates no cause of action for the contractor. *See General Dynamics C4 Systems, Inc.,* ASBCA No. 54988, 08-1 BCA ¶ 33,779 at 167,193.

We also find no merit in appellant's argument that the CO abused her discretion by not granting STS's request for a waiver of the U.S.-flag requirement. As we found in the findings above, there is no evidence that a waiver of the U.S.-flag requirement would have provided STS with any monetary relief since a U.S.-flag carrier was in fact the lowest priced carrier quoting to STS.

Mutual Mistake

STS seeks reformation of the contract based on the fact the shipping costs increased allegedly 544% which was not anticipated by either party. Citing *Dairyland Power Cooperative v. United States,* 16 F.3d 1197, 1202 (Fed. Cir. 1994), appellant correctly cites the four requirements that must be proven to recover on a theory of mutual mistake: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and, (4) the contract did not put the risk of mistake on the party seeking reformation" (app. br. at 39). Appellant argues that it is entitled to contract reformation on the basis that both parties believed that transportation costs to Jordan would be less than $300,000 and that "the contract does not specifically place the risk of such a drastic increase in the price of shipping on STS. The failure to allocate such a risk supports the argument that neither party anticipated the increase in shipping costs." (App. br. at 40) We disagree. Again, a firm fixed-price contract assigns

17

any increase in costs to the contractor, thereby insulating the government from price fluctuations. *Spindler*, 06-2 BCA ¶ 33,376 at 165,462-43, *see also Demusz Mfg.*, 07-1 BCA ¶ 33,510 at 166,054.

Appellant's attempt to define the mutual mistake as the erroneous belief that transportation could have been accomplished for $300,000 is faulty given that transportation costs were not fixed at the time of contract award; therefore the parties could not have had an erroneous belief as to an existing fact regarding the cost of shipping. The only transportation "fact" that existed at the time of contract award was that it was STS's responsibility to ship the trainer to Jordan. There were no "facts" regarding the cost of shipping except that they would be borne by STS. STS's prediction or judgment as to the cost of shipping in the future, even if erroneous, is not a "mistake" but was a business decision. *See AECOM Government Services, Inc.*, ASBCA No. 56861, 11-1 BCA ¶ 34,667 at 170,773.

II. Increased Costs Due to Government Provided Equipment and Labor

STS argues that FAR 52.245-2,[4] GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) (MAY 2004), which specifies the rights and responsibilities of the parties in the event that the government supplies equipment to be used by the contractor in contract performance, should be inserted into the contract per the *Christian* doctrine. *See G.L. Christian & Associates v. United States*, 312 F.2d 418, *reh'g denied*, 320 F.2d 345 (1963), *cert. denied*, 375 U.S. 954 (1963) (where an omitted clause is required by the procurement regulations as applicable to a contract, and the clause expresses a significant strand of public procurement policy, it is incorporated into that contract by operation of law.).

However, this was a Commercial Items contract and the contract terms and conditions for such contracts seem to be in large part governed by FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS and FAR 52-212-5, CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS – COMMERCIAL ITEMS, and we find nothing in those regulations, and the parties have pointed to none, that compel the inclusion of a government property clause. We therefore decline to incorporate one by operation of law and thus the contract contains no express warranties with respect to government-furnished property. We therefore look to

---

[4] Appellant's brief cites to FAR 52.245-1; however, as appellant is discussing government-furnished equipment, we believe FAR 52.245-2 is the intended clause. As this contract was awarded on 6 August 2006, the May 2004 version of the clause and regulation were in effect as set forth in the 1 July 2006 edition of the FAR. FAR 52.245-1, PROPERTY RECORDS (APR 1984) is concerned with which party is responsible for record keeping with respect to government property.

18

the clause in the contract and the surrounding circumstances to determine if an implied warranty is applicable.

*Ekco Products Co. v. United States*, 312 F.2d 768 (Ct. Cl. 1963), involved a contract to manufacture cartridge cases. Prior to award, Ekco made an offer to provide the cartridges, but stated it would require five Head Turning Machines to perform the contract and that it could procure and install the five machines or alternatively the government could provide them, in which case Ekco wanted the opportunity for prior inspection and acceptance of the machinery from government reserves. The government agreed to furnish the five machines. Ekco was informed that the machines were coded for the condition they were in and the meaning of the code was explained to Ekco, but otherwise no representations were made as to the condition of the Head Turners. The contract did not include a government-furnished property clause. The machines broke down continuously. The Court stated:

> We must decide whether the arrangements thus agreed upon between the parties imposed a warranty obligation on defendant as to the condition of the machines. Was there a warranty of fitness for use on the facilities? There is no express warranty stated in the contracts between the parties. Nor is there any disclaimer of warranty in either contract. If a warranty existed, then, it must be implied....

> Defendants owned and kept title to the Head Turning Machines during the entire period of production. Use and possession of the facilities, however, were given to plaintiff. The bailor-bailee relationship thus created was for the benefit of both parties. Defendant was able to induce plaintiff to accept the contract obligations and manufacture the cartridge cases; plaintiff expected to receive its profit upon successful completion of the contract. The law applicable to this situation is clear. Where there is a bailment for the mutual benefit of the parties, there is imposed on the bailor, in the absence of a special contract or representation, an obligation that the thing or property bailed for use shall be reasonably fit for the purposes, or capable of the use known or intended. There is no question in this case but that plaintiff needed these machines to manufacture the cartridge cases, and that defendant gave the machines to plaintiff expressly for this purpose. Whether the O-2 symbol created a warranty is unimportant to decide; the arrangement itself between the

19

parties gave rise to the warranty on the machines. [Footnote omitted]

312 F.2d at 771-72.

Similarly, here STS needed the government-furnished equipment to complete the work and the government-furnished this equipment expressly for that purpose. It would be unreasonable to expect appellant to have inspected the equipment prior to award and prior to even arriving in Jordan to assemble the airframe. Accordingly, we find an implied warranty that the equipment would be fit for the intended purposes and in many instances it was not.

When the government agreed to provide the equipment and labor to assemble the trainer, STS had a reasonable expectation that the equipment would be fit for use and the labor would be able to perform the task. It was simply not enough that six laborers showed up at the jobsite. Based upon our findings, the laborers lacked many of the basic and necessary skills to assist in the assembly of the trainer (finding 40). The government had a responsibility to provide labor that could assist in the assembly of the aircraft and they were less skilled than promised (finding 26).

Specifically addressing the heavy lifting equipment, while a complete list of necessary equipment may have been helpful for planning purposes, the government agreed to provide heavy lifting equipment and from the evidence, it is evident that the equipment provided was often not suited for its intended purpose (finding 37). The government did not know, prior to contracting, what equipment would be necessary to lift the trainer into place. The fact that the spreader bar was not on STS's initial list of items necessary for lifting does not change the fact that the government agreed to provide lifting equipment on site, and the Corps does not dispute that the spreader bar and lifting cables were necessary equipment for lifting. In other words, the addition of the spreader bar to the list of government-supplied equipment did not change the government's bargain with STS. At the time the CO signed the contract, she did not know what equipment was necessary to perform the task of lifting the trainer, nevertheless, the government agreed to these terms; therefore, the government cannot now claim that they did not agree to provide the spreader bar, a necessary piece of heavy lifting equipment. We find that STS has provided ample evidence that the laborers had inadequate skills, and much of the equipment was not suited for its intended purpose.

Prior to award, the government knew and agreed that STS would require equipment on site to aid in assembling the aircraft (findings 20, 22). The contract stipulates that "[t]he Government shall provide heavy lifting equipment and a minimum of 6 laborers during the assembly of the fuselage structure on site" (finding 20). Following contract award, STS notified the government that it would require many items

20

which, on their face, do not appear to be "heavy lifting equipment" including an AC & DC portable power unit, a portable MIG welder with $CO_2$ shielding, an oxygen/acetylene rig (cutting torch), and a staircase up to the aircraft (finding 23). The government agreed with the terms of STS's request as evidenced by its contract with AICI to "[p]rovide all equipment, support and materials...including support of installation and erection by STS" (finding 27). Therefore, we find the government's attempt to now limit its responsibility to only "heavy lifting equipment" is unavailing. Had the government notified STS prior to its arrival in Jordan that nothing other than "heavy lifting equipment" would be provided, STS could have supplied its own equipment, thus potentially avoiding many of these faulty equipment delays. We believe from the evidence, it was never the intention of the parties to limit government-supplied equipment to only "heavy lifting equipment." We place great weight in the pre-dispute conduct of the parties in determining the parties' intent. *Logistic Services International, Inc.*, ASBCA No. 38616, 90-1 BCA ¶ 22,346 at 112,294; *see also Monterey Mechanical Co.*, ASBCA No. 51450, 01-1 BCA ¶ 31,380 at 154,949. Here, the parties' conduct prior to the dispute demonstrated that both parties believed that the government would provide more equipment than just heavy lifting equipment and where that equipment is faulty, the government is liable for delays caused thereby.

The REA describes the claim for hours lost due to faulty equipment, supervision of laborers as well as the claim for the cost of purchasing and leasing equipment as follows:

> In total STS lost 1,139 man-hours (113.9 days) because of the failure of the government to timely provide equipment and labor. Of those hours 60 were lost to delays caused by the Corps, 336 were lost because of problems with the furnished equipment, and 743 were lost supervising the laborers. These additional hours constituted a direct cost impact on STS, as it had to compensate its employees for this time. The employees received $311.00 per day in per diem and a labor rate of $27.50 per hour. The total cost to STS for per diem and labor caused by the Government's failure to provide adequate labor support was $323,215.24. The total cost for labor and per diem for delays caused by the Government-furnished equipment was $41,786.95. Additionally STS was also forced to purchase and rent equipment while on site that should have been provided by the government.

(R4, tab 8 at 21)

21

, Based upon our findings appellant is entitled to recover the cost expended to obtain equipment needed to assemble the airframe in Jordan. The rest of this claim for faulty equipment and supervision of laborers is more problematic however. While we are confident, based on our findings that the labor provided by the government was inadequate and often absent due to religious and local holidays, and while we are equally confident, based on our findings, that the equipment was frequently faulty, the evidence supporting the effect of same on project duration is spotty at best.

In its brief appellant proposes findings to establish the truth of the assertion quoted above from the claim with regard to lost hours due to faulty equipment and inadequate labor and cites to the very same page of the REA quoted above (app. br. at 27-28). No attempt is made to demonstrate the impact of the causes of delay on the project schedule if there in fact was one. We can only speculate as to when the work would have been completed but for the delays due to faulty equipment and supervision of laborers. Prior to, and at the hearing we advised the parties that the extent of delay is a necessary element of an entitlement case. Appellant bears the burden of proving both government fault and the length of that delay. We stated in *American Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,795, as follows:

> The government argues that, even if entitlement is found for the contractor, American Ordnance is not entitled to damages for delay because it both concurrently delayed production by delaying submission of its ECP to use NT-60, and failed to reasonably calculate its delay (gov't br. at 139-46). As discussed in *Fox Construction Inc.*, ASBCA No. 55265 *et al.*, 08-1 BCA ¶ 33,810, a "delay connotes a time period [that] completion of a project must be extended to account for slow-down or unanticipated events" (*id.* at 157,379). The burden of proof is upon the contractor to establish both government fault and the length of that delay:
>
>> To recover delay damages, a contractor has the burden of demonstrating that the specific delays were due to government-responsible causes, that the overall completion was delayed as a result, and that any government-caused delays were not concurrent with delays within the contractor's control. The mere fact that a contractor took more time than it thought it should take is in itself meaningless. "The length of time is meaningful only in relation to the effect it had on the project operations." *Law v. United States*, 195 Ct. Cl. 370, 384 (1971); *Jefferson Construction Co. v.*

*United States*, 368 F.2d 247, 256 (Ct. Cl. 1966) (noting it is the contractor's burden to show "where the work was delayed because of the lack of approval").

Although appellant has neither asked for nor proven a specific time extension, in light of our findings of faulty labor and equipment, we will try to analyze the facts as we have found them to ascertain if a reasonable basis for determining the proper time exists. Our analysis begins with the recognition that STS thought it could finish the on site work in four to six weeks and the contract completion date established by the contract was 1 September 2008. We have no credible proof that the anticipated duration was reasonable but we assume it would have taken at least all six weeks. Thus, in order to finish by 1 September 2008, appellant would have had to arrive on site with the crated airframe no later than six weeks prior to 1 September or by 21 July 2008. We also know that the ship arrived a combined 72 days later than anticipated (40 days late arriving for loading and 32 days longer en route than anticipated). The 72-day late arrival was excusable but not compensable and extended the contract completion date to 12 November 2008. Of the 60 man-hours claimed due to the Corps, we find entitlement to 48 man-hours or about 1.2 calendar days assuming 4 STS employees. We exclude the weather delay as it is not excusable under these circumstances absent a showing that such weather was unusually severe. The 336 man-hours lost due to equipment issues computes to 33.6 man days and since there were usually 4 STS employees, that computes to about 8.4 calendar days. Together the two further extended the completion date by about 10 days or to 22 November 2008. We further find that such delays were not concurrent with other delays.

We do not find entitlement to a time extension for labor supervision because appellant planned to use one employee almost full time supervising the labor and we do not know the extent to which the hours claimed were part of the planned supervision or whether it was in excess of it. Thus we find entitlement to the claimed delay costs from 13 November 2008 through and including 22 November 2008 or 10 days.

## III. STS's Loss of Efficiency

STS alleges that because the government hindered performance and interfered with STS's performance, the contractor's performance was pushed into November and December without proper clothing or gear causing a loss of efficiency.

The Jordanian customer took delivery on 10 February 2009 (finding 48). We found that shipping delays amounted to a total of 72 days for which neither party can be held responsible (finding 19). The government did not cause performance to be pushed into November and December, the late shipping did that. Appellant has not proved that the government is responsible for STS's loss of efficiency.

23

## CONCLUSION

Appellant is entitled to compensation for 10 days of delay and the cost of acquiring equipment while on the jobsite. In all other respects, the claim is denied. The matter is remanded to the parties to resolve quantum in accordance with this decision.

Dated: 23 January 2014

RICHARD SHACKLEFORD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

MICHAEL T. PAUL
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57095, 57166, Appeals of Safety Training Systems, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

24